BAILES, Judge.
The plaintiff brought this tort action against General Gas Corporation, and its public liability insurer, Hartford Accident .& *771 Indemnity Company, to recover damages sustained by him when his home and the contents thereof were destroyed by fire on May 28, 1957. The original plaintiff died during the pendency of this litigation in the lower court. On proper motion in the trial ■court, his residuary legatees were substituted as party-plaintiffs.
The damages claimed by the plaintiff were itemized in his petition as $50,000 for the value of his home; $22,757.55 for the contents of his home; and $12,500 for loss of use, mental anguish, suffering and worry occasioned by the fire and replacement of his home and contents. The total amount sued for was $85,257.55.
The trial court rendered judgment in favor of the substituted plaintiffs and against both defendants, in solido, for the sum of $55,379.07, with legal interest from date of judicial demand until paid. From this adverse judgment, the defendants appealed.
For a cause of action, plaintiff alleged that General Gas Corporation was engaged in the business of handling, selling and supplying butane gas, and the selling, installing and servicing of butane gas equipment; that he was a customer of defendant gas company; that it regularly supplied butane gas to him as well as regularly serviced all of his equipment which had been previously bought from defendant gas company; that the defendant gas company, acting through one or more of its employees, regularly checked the level of gas in his two tanks, and if gas was needed, the defendant gas company filled the low tank and transferred service from the low tank to the full tank; and plaintiff’s petition further alleged:
“5.
“That on May 28, 1957, one of the employees of said General Gas Corporation came to plaintiff’s home during the morning, while plaintiff was out of town, on one of his periodic stops, checked the gas level, found same to be low in one tank, and proceeded to change over the gas supply to the full tank, preparatory to filling the tank that was low.
“6.
“That prior to the arrival of the General Gas employee, plaintiff’s butane tanks and equipment were functioning properly and no gas was leaking or escaping.
“7.
“That while the employee of General Gas Corporation was servicing the butane tanks and equipment of plaintiff and acting in the course and scope of his employment, in some manner he permitted gas to escape and to continue to escape from the tank and its supply lines in such quantity and in such force that the gas went under, into and around plaintiff’s home in considerable volume and quantity and was allowed to continue to escape by said employee as ■aforesaid so as to finally cause an explosion and fire.
“8.
“That the aforesaid fire was apparently brought under control and extinguished ; that, however, during the afternoon of May 28, 1957, after the General Gas Corporation and its employees, acting in the course and scope of their employment, that were called to the scene had departed, fire again became apparent or again broke out in plaintiff’s home, completely destroying the home and contents.
“9.
“That all of the facts and circumstances surrounding said explosion and fires are exclusively within, the knowledge and control of defendants; that at all times prior and subsequent to said explosion and fires, the butane tanks, equipment and gas of plaintiff were exclusively within the control and under the supervision of defendant General Gas Corporation and its employees; *772 that said explosion and fires are of a kind that do not occur without negligence; that plaintiff specifically pleas (sic) that the doctrine of Res Ipsa Lo-quitur is applicable herein.
“10.
“That in the alternative, both fires were the direct result of the negligence of defendant’s employees in allowing the gas to escape from the butane tank, and in failing to take proper steps to protect the property of plaintiff after the gas was permitted to escape, and in failing to shut off the escaping gas after it started escaping.
“11.
“That in the alternative, the employees of General Gas Corporation failed to make sure that the original fire, caused by their negligence, as aforesaid, had been completely extinguished.
“12.
“That in the alternative, the employees of General Gas Corporation, knowing the properties of butane gas and of the fact that it will accumulate in walls, pockets and other places in buildings, failed to make sure that all of the gas which was negligently allowed escape, was completely removed from plaintiff’s home.”
Defendants’ answer consisted primarily of a denial of all of the acts of negligence attributed to the employees of General Gas Corporation in plaintiff’s petition quoted supra. Defendants affirmatively alleged that the explosion and fires were caused by a defective valve located on the tank owned by plaintiff. Defendants denied that General Gas Corporation performed any service whatever on the plaintiff’s butane gas equipment except on call and by order of the plaintiff. Alternatively, the defendants pleaded contributory negligence on the part of the plaintiff. As this plea of contributory negligence does not figure in this opinion, we will not further allude to it herein.
During the trial of this case, it was stipulated between plaintiff and defendants that General Gas Corporation performed no service whatever on the plaintiff’s gas equipment except on special request of the plaintiff to perform a particular service, and that plaintiff paid for that service on each occasion. Therefore, this contention of the plaintiff, as alleged in his petition, passes out of any consideration in the case.
While there is some conflict in the testimony as to the exact sequence of action of Mr. Earl J. Dupuy, the gas deliveryman in the employ of defendant, General Gas Corporation, we do not find a resolution of this conflict crucial to a determination of the issue before us. We will resolve the conflict, however, infra, in discussing this witness’ testimony.
We find the following facts : For a number of years prior to the occurrence of this accident, plaintiff had puchased his butane gas and required equipment from General Gas Corporation. It was mutually agreeable for the deliveryman to make deliveries of gas to the plaintiff’s tanks in the absence of the plaintiff. Therefore, there was nothing unusual about the delivery of the butane gas on the morning of May 28, 1957, in the absence of the plaintiff from his residence. On this particular occasion, plaintiff, accompanied by his housekeeper and another employee, was in New Orleans for the day.
On a routine call to the Geismar community on this date, Earl J. Dupuy, a duly licensed butane gas deliveryman in the employ of General Gas Corporation called at the residence of the plaintiff for the purpose of ascertaining whether plaintiff needed any gas. On examination of the proper indicator located in the dome of the underground gas storage tank, Mr. Dupuy determined that one of the tanks, the one then in service, was low.
The gas storage facility of the plaintiff consisted of two 410 gallon underground Delta storage tanks. These tanks were located about fifteen feet from the side of the *773 residence approximately parallel to each other, with the supply lines connected in a manner as to provide a continuous flow of gas from either tank, or from both tanks simultaneously by the manipulation of valves located within the dome of the tanks. The plaintiff possessed what is known in the industry as a “tie-in” system, which, as we understand from the record, means that the two tanks are tied together on the low pressure side of the system to afford, as we have above described, continuous service from either tank without interuption of service. This tie-in is accomplished by the low pressure line from each tank being affixed to the lateral opening of a tee fitting with the single supply line to the house affixed to the center opening of the tee.
We should explain that each tank is buried in the ground at such depth that the dome thereof, located and affixed to the side of the tank centered between the two ends, protrudes partially above ground level. Included within the dome of each tank is a filling fixture to which the delivery hose is attached by screw threads for filling the tank with liquefied gas; a high pressure line running from the tank to the high pressure side of the regulator; the regulator itself, the purpose of which is to reduce the high pressure gas of upward to 60 psi, or more, depending upon temperature, to approximately 6.37 ounces psi (or as designated in the industry to 11 inches water column), and to maintain a constant low pressure gas supply to gas appliances; a low pressure line from the regulator extending toward the residence; a gauge which indicates the quantity of liquefied petroleum in the tank; and a valve operated by a hand wheel which, when closed, cuts off the flow of any gas whatever from the tank into the regulator and into the system. Whatever else is located in the dome is not pertinent to a discussion of the facts herein.
On this occasion, the appliances in the residence were being supplied from the tank nearest the residence, and the other tank was cut off and in reserve. It was the custom of the plaintiff to use from only one tank at a time, thus keeping the other tank full and in reserve. After determining to deliver gas into the tank that was then in service, Mr. Dupuy took his transfer hose from his delivery truck, connected it to the intake fixture of the low tank, that is the one that was in service and located nearest the residence, inserted his delivery slip in the meter on his truck, engaged his pump and began to deliver liquefied butane gas from the tank of his delivery truck into this storage tank. Thereupon he went to the tank that had been on reserve (which was to be put in service), opened the valve which permitted gas to flow from the tank into the regulator and the low pressure distribution system. The effect of opening this valve was to cut this tank into the distribution system. Upon opening this valve (the further effect of which was to make both tanks operational and actually tied the two tanks together), Dupuy heard a hissing sound in the dome of the tank that he was pumping gas into and which had been furnishing gas to the residence.
Sensing that something was amiss in the system, Mr. Dupuy cut off the tank nearest the house, this being the one from which the hissing sound was coming. He then went to the truck and turned off the pump. Next, he cut off the tank that had been on reserve, this being the one that he had just previously cut into the system.
Not knowing what was wrong with the system, he realized that he needed help to cope with the trouble. As his truck was equipped with two-way radio for communication with the Baton Rouge district office of his employer, he attempted to call for assistance. However, because of atmospheric disturbance, he was unable to communicate with the company office to advise his superior that he needed help. Thereupon, without doing anything else, he went to a nearby store of which the ■plaintiff was part owner where he called the Baton Rouge office on the telephone. He returned to his truck, remained there for a short time, then again went to the *774 store for the avowed purpose of calling Gonzales to learn if he had any calls for gas from other customers. While in the store on this second occasion, someone came in to report that there had been an explosion in the plaintiff’s residence.
There appears to be a conflict in the testimony of Dupuy as to the purpose of his going to the store the first time and what transpired when he returned to the locus of the tank and his return to the store the second time, and the testimony of Mr. Coy Aldridge, a bookkeeper at the store for the plaintiff. This witness contends and so testified that when Dupuy came to the store after having first gone to the residence and stated to him that he was having trouble and needed to use the telephone, and that he called Gonzales and then Dupuy returned to the tanks; that about ten minutes later he returned to the store in a nervous state, in a rush, in a very excited manner and asked that he, Aldridge, return to the tanks with him; that he returned with him and when he got there gas was boiling up in a heavy vapor from the dome of the tank nearest the residence and was making a hissing sound; that Dupuy wrapped a handkerchief around a pair of pliers and began to tap on something on the tank. Mr. Ald-ridge testified that they stayed there about ten minutes and returned to the store; that just as Dupuy started to call Baton Rouge he heard a terrific explosion at the residence.
In view of the well established fact that no gas was escaping from any of the appliances in the kitchen after the explosion or flash fire, and no one smelled any butane gas escaping in the kitchen, we are convinced that Dupuy had cut off the gas from both tanks before going to the store to call Baton Rouge for help.
Actually, the conflict in the testimony is of no consequence in reaching a decision in this case, because we have found that the gas was cut off as stated by Dupuy, and whatever occurred in the system to cause high pressured gas to enter the distribution system occurred prior to Dupuy going to the store the first time.
Immediately after the explosion, Mr. Du-puy returned to the locus of the tanks, removed his truck from the proximity of the house, secured a fire extinguisher from his truck and went into the kitchen of the plaintiff’s home.
The evidence shows that the interior of the kitchen was filled with smoke, the paint was blistered and the furniture was scorched.
A number of people assembled at the house after the explosion, including the cousin of the plaintiff, Mr. Leon Geismar, who in the absence of the plaintiff, took charge of the premises. Several persons made a search of the premises to determine that apparently the fire had been extinguished. The assistant chief of the Gonzales fire department was present and participated in a determination that the fire had been extinguished. The plaintiff was notified of the explosion and fire in New Orleans, and he returned to his residence about the middle of the afternoon. Somewhere around five' p. m., the residence was totally destroyed by fire.
The plaintiff offered no testimony or evidence whatever as to the cause of the high pressure gas entering the distribution line, or as to how the first or second fire was started. The proof of the plaintiff’s case consisted in the main of showing that the system was in proper operation and was functioning normally when Mr. Dupuy arrived to fill the tank.
Drom our careful and painstaking analysis of the evidence in the record, we are thoroughly and completely convinced that the cause of the inflammable and explosive gas entering the atmosphere of the kitchen was caused by a malfunction of the regulator. This brings us to say that a determination of this malfunction requires an appreciation of the composition, construction, purpose and function of the *775 regulator. This knowledge is peculiarly within the field of engineering and we are going to have to depend upon experts in the field of engineering and those especially trained in the utilization and handling of liquefied petroleum products to assist us in determining the malfunction of this regulator.
The defendants offered the testimony of Mr. Wharton A. LeBlanc, district manager of defendant, General Gas Corporation, of the Baton Rouge district. The trial court accepted Mr. LeBlanc as an expert in the field of liquefied petroleum gases. He is a graduate of Louisiana State University, a registered mechanical and agricultural engineer in this state; has completed correspondence courses of study in subjects dealing with liquefied petroleum products and gases and has actively worked both in the engineering and marketing phases of the gas business for about twenty years. Also, the defendant offered the expert testimony of Mr. H. Emerson Thomas of Westfield, N. J. His qualifications are most impressive. He is a graduate of Oklahoma City University. He first became associated with the liquefied petroleum gas business in the late 1920’s as an employee of Phillips Petroleum Company. He left Phillips in 1942, however, in the interim he worked in the gas industry in Oklahoma, Michigan and in the main office in New York handling the overall operations in that section. He did contact work with groups such as the National Board of Fire Underwriters, National Fire Protection Association, Interstate Commerce Commission and Bureau of Explosives, American Gas Association, Liquefied Petroleum Gas Association, the Bureau of Steamboat Inspection and Navigation and other federal and state governmental organizations dealing with liquefied petroleum gas. He has performed studies and experiments in connection with the behavior of these gases, and has appeared many times as an expert witness in court. At the present time, Mr. Thomas is actively engaged in the liquefied petroleum gas business as an operator and also as a consultant to the industry. The trial court recognized Mr. Thomas as an expert in' the field of liquefied petroleum gas. These two witnesses were the only experts to testify in the trial.
From the testimony of these two witnesses, the record abounds with testimony of a very technical nature explaining, probing and reprobing the purpose, operation, function and malfunction of regulators of the kind and type utilized in the regulation of gas pressure on the subject system.
While this testimony is instructive and enlightening to us, we find that it would serve no useful purpose to review it in detail. We believe it will suffice to say that the regulator is a mechanical instrument possessing two chambers, one referred to as the upper chamber and the other as the lower chamber. The lower chamber is where the gas is admitted from the tank and from which it is discharged into the distribution system. In this lower chamber at the opening or orifice where the incoming gas from the storage tank is admitted there is a valve that is operated through the use of a lever and an arm attached to a metal disc that is contiguous to the diaphragm. This diaphragm is that part of the regulator which completely separates the lower chamber from the upper chamber. This diaphragm is operated by the joint action of a pre-set spring and the incoming gas. The pre-set spring, referred to is located in the center of the diaphragm and the upper chamber and extends from the diaphragm to a recess in the dome of the upper chamber. It was stated above that the diaphragm completely separates the upper chamber from the lower chamber. This is true, except in the center of the diaphragm there is an aperture through which the low pressure safety relief valve operates. This safety relief valve is operated by a spring located within the larger spring situated in the upper chamber and is preset to open when there is in the lower chamber a pressure of gas equal to or in excess of 20 ounces.
*776 The proper operation or function of this regulator depends upon the existence of a port, aperture or passage to the exterior or atmosphere in order that the regulator may “breathe”, or the diaphragm, that part of the instrument which divides the lower and upper chambers, may move up or down in the regulation of the pressure. This opening or aperture above referred to is covered with a very fine screen or mesh on the outside of the regulator. In addition to permitting the diaphragm tO' move freely up and down through its communication with the outside atmosphere, this opening also serves as an exit to the outside for any gas that is released into the upper chamber through the operation of the low pressure safety relief valve.
This regulator forms an integral part of the system. It is located in the dome of the storage tank, where, depending on the temperature of the liquefied petroleum gas, a relatively high pressure exists, and the beginning of the distribution system where a low line pressure of six ounces is maintained. The regulator is a contrivance or device in which the relatively high tank pressure is reduced to a low line pressure, and which maintains in the system a constant supply of low pressure gas.
In its proper and normal operation, that is, if the regulator is functioning correctly and as intended, the admission of high pressure gas in to the lower chamber forces the diaphragm and smaller but contiguous metal disc up. The upward movement of the diaphragm and metal disc activates the lever and arm which reduces the size of the orifice through which the high pressure gas is admitted, and thusly, reduced the pressure of the gas to the desired 6.37 ounces psi.
Upon being advised of the explosion at the plaintiff’s residence, Mr. Wharton A. LeBlanc went immediately to the plaintiff’s residence. He arrived there about noon and went directly into the kitchen to examine the damage. After surveying the area, he instructed his workmen to remove the dome from the tank which had been on reserve. It was his purpose to remove and examine the regulator which he felt was faulty. He disassembled it and determined the cause of the failure. He found that the minute screen or mesh over the external communicating opening in the upper chamber of the regulator was covered with a white slimy mucous substance such as might be deposited by a spider. It was found that this substance over the screen completely inhibited the passage of air and was the cause of the malfunction of the regulator. This condition was shown to Mr. Leon Geismar, a Mr. Hart, an insurance adjuster, and a Mr. Harp, an insurance agent, all of whom were in the kitchen at that time. There is no dispute about the finding of this described substance over the screen or mesh above referred to. After some discussion with Mr. Leon Geismar, Mr. LeBlanc instructed the servicemen present to install a new regulator. He explained that, although in his opinion after he removed the foreign substance from the screen the regulator would function properly, for peace of mind for the plaintiff, a new regulator was installed.
Mr. LeBlanc also instructed his service supervisor to remove, lubricate and replace all valves on all gas appliances in the residence as these valves had been unseated by the high pressure gas that entered the system when the regulator malfunctioned earlier in the filling of the tank by the deliveryman. It was the unseating of these valves that permitted the gas to escape into the kitchen. All lines were checked, the system was put back into service and then Mr. Dupuy uneventfully completed the filling of the tank undertaken that morning.
In its written reasons for judgment, the ■trial court, inter alia, stated:
“ * * * The record shows without doubt, substantiated by the physical facts, that when gas began escaping from the air vent of tank No. 2, gas under pressure in excess of 5 pounds was at the same time enter *777 ing the service line into the home. This pressure was strong enough to dislodge the valves on the kitchen range permitting the entry of gas into the Geismar kitchen. This gas was subsequently ignited and the flash fire and explosion followed. It is common knowledge that gas in an enclosed room may be ignited by static electricity, an electrical appliance or by a pilot light on a gas appliance. Each and all of these were present in the Geismar kitchen.
“The defendant makes three contentions. First, that gas under pressure was permitted to enter the Geismar kitchen because of the stoppage of the air vent in the regulator of tank No. 1. This was a defect in the appliance owned by M. Geismar of which a route man would not be required to have knowledge. Second, that the amount of gas entering the kitchen could have occurred within a period of 2 or 3 minutes after opening tank No. 1. Third, that the route salesman acted as reasonable and prudent man in shutting off tank No. 1 within this period of time. The defendants attempt to substantiate these conclusions by the expert testimony of Mr. H. Emerson Thomas, an eminent authority on the nature and uses of propane-butane gases.
“After carefully considering the testimony of Mr. Thomas, the court cannot agree that the stoppage was the proximate or primary cause of gas entering the kitchen at an excessive pressure. It was this witness’ conclusion that the stoppage prevented the diaphragm from ‘breathing’ which resulted in the excessive discharge. It must be borne in mind that even though the vent was clogged the excess pressure would have pushed upward against the springs as hereinabove described. This operation is not dependant upon air pressure. The diaphragm breathes when the pressure below the diaphragm is less than 6 ounces. At the time of the filling, there was no appreciable drain by the appliances in the home. The pressure below the diaphram should have remained at the constant 6 ounces dependent upon the spring tension and not atmospheric pressure. We cannot agree with the defendant that the cause of the malfunction is known. No satisfactory explanation is given as to why high pressure gas entered into the system in the first place.
í{í í}í sji ^ ^
“Mr. Thomas also expressed the opinion that escape of gas from the air vent in this manner was an unusual occurrence and beyond the experience and training of Dupuy. We do not concur in this belief. It was unusual but not unexpected or unforeseeable. The regulators were supplied with low pressure relief valves especially designed to open and discharge the gas through the air vent when the pressure of gas going into the service line exceeded 23 inches of water column. The very presence of these valves indicated this possibility. Their activation could hardly be called a malfunction.
“Mr. Norman (sic) LeBlanc testified that it was impossible to manually adjust the springs so that each tank would uniformly supply gas to the house if both cut off valves were opened. Because of this it is reasonable to assume that if gas, at excessive pressure, entered both regulators, one of the low pressure relief valves might go into operation before the other. It would also follow that when one valve was activated the pressure could be so relieved that the other valve would remain closed. Accordingly, it would be reasonable to anticipate that excess pressure would not necessarily result in the opening of both relief valves with a discharge of gas through both air vents. The fact that the plugged vent may have been an additional *778 reason for gas not to discharge through this vent does not mitigate against the knowledge that excess pressure may have been discharge through only one vent. An employee charged with the responsibility of filling “tie-in” tanks under pressure with an inherently dangerous substance should have known of an expected or foreseeable possibility.'
“Mr. Dupuy should have known that with a tie-in system, the excess pressure could have been relieved through either regulator. He did know that if he cut both valves the pilot lights would have been extinguished in the home which would have caused him trouble because of Mr. Geismar’s absence. Because of this, he permitted several minutes to elapse which high pressure gas was going into the kitchen through the service line.
“When Dupuy finally cut off tank No. 1, he knew or should have known that high pressure gas had entered the service line and the home. Instead of investigating the premises immediately he waited some 20 to 30 minutes for the arrival of a service truck. Before their arrival, the explosion in the kitchen had occurred. We cannot help but feel that his actions and hesitation during the period of time that gas began escaping from the vent of the regulator and his actions thereafter constituted negligence. (Emphasis supplied.)
* 5|S * * i(C *
“Accordingly, if Dupuy were negligent after the alleged malfunctioning, it would make no difference to whom the gas system belonged or the nature and cause of the alleged malfunction. However, under more recent decisions of the Supreme and Appellate Courts, the doctrine of Res Ipsa Loquitur is patently applicable to the instant case. In the case of Mosely v. Sears, Roebuck and Company [, La.App.] 167 So.2d 408 the Eirst Circuit Court of Appeal held that this doctrine was applicable under the factual situation where an agent was the last one to tamper with or activate an appliance, although in possession of the plaintiff, and a fire occurred some two hours after the agent’s action. The Court further held that upon giving application to the doctrine the burden of proof then shifted to the defendant to prove the accident resulted from causes other than ones for which it was responsible.”
Our appreciation of this case compels us to first consider the occurrence of the high pressure gas getting into the plaintiff’s distribution system to determine whether this occurred through any fault of the defendant, General Gas Corporation. Should we find that this defendant was free of negligence, we would then consider whether Mr. Dupuy, the deliveryman, breached any duty owed to plaintiff which was the proximate cause of the explosion and ultimately the cause of the loss suffered by him.
The trial judge held that “* * * under more recent decisions of the Supreme and Appellate Courts the doctrine of Res Ipsa Loquitur is patently applicable to the instant case. * * (Emphasis supplied.) Further, the trial judge found that the defendants did not sustain or discharge the burden placed upon them by this doctrine.
The doctrine of res ipsa loquitur, a rule of evidence the use of which is to be determined after the trial of a case, has no application where the cause of the occurrence or event complained of is fully supported by the evidence.
In Day v. National United States Radiator Corporation (1961) 241 La. 288, 299, 128 So.2d 660, the Supreme Court had this to' say about the doctrine' of res ipsa loquitur::
*779 “[1-3] As this court has often said, the doctrine of res ipsa loquitur is a rule of evidence, the applicability of which is to he determined in each case at the conclusion of the trial. When the doctrine of res ipsa loquitur is applicable to a case, the accident which has caused plaintiff’s damages makes out a prima facie case of negligence by the defendant, and the burden is then on the defendant to show absence of negligence on its part. Gerald v. Standard Oil Co. of Louisiana, 204 La. 690, 16 So.2d 233; Hake v. Air Reduction Sales Co., 210 La. 810, 28 So.2d 441; Northwestern Mutual Fire Association v. Allain, 226 La. 788, 77 So.2d 395, 49 A.L.R.2d 362, and authorities there cited. This doctrine is a qualification of the general rule that negligence is not to be presumed but must always be affirmatively proved, and therefore should be sparingly applied, and only in exceptional cases where the demands of justice make that application essential. See Security Insurance Company v. Omaha Coca-Cola Bottling Co., 157 Neb. 923, 62 N.W.2d 127; Nopson v. City of Seattle, 33 Wash.2d 772, 207 P.2d 674; 65 C.J.S. Negligence § 220, p. 1031.
“The following is found in 38 Am.Jur. 999, sec. 303, Negligence:
‘The doctrine of res ipsa loquitur has no application where all the facts and circumstances appear in evidence. Nothing is then left to inference and the necessity for the doctrine does not exist. Being a rule of necessity, it must be invoked only where evidence is absent and not readily available. It is not to be invoked where the evidence is available, and certainly not when it is actually presented. Nor has it any application where the cause of the accident is known and is not in question.’
“On this point, see also Res Ipsa Loquitur — Availability, 33 A.L.R.2d 791, 793; Prosser, Handbook on the Law of Torts, p. 214 (1955).
******
“[4] Although the plaintiff was justified in relying on the doctrine of res ipsa loquitur in her petition in this case because she was ignorant of the cause of the boiler explosion which killed her husband, under the above authorities the doctrine should not be used by this court in deciding the suit, nor should it have been relied on by the Court of Appeal or by the district court in finding for petitioner. As shown by the authorities, its applicability is to be determined at the conclusion of the trial. In the instant case all the facts and circumstances leading to the explosion of the boiler are in evidence, the cause of the explosion has been fully established by the evidence and nothing is left to inference. Therefore, since the rule is not applicable here, we must determine whether plaintiff in the instant case has proven by a preponderance of the evidence that the architects were negligent and that their negligence has causal connection with, or was a proximate cause of, the boiler explosion which killed Day.”
The nature of the occurrence of high pressure gas going from the storage tank through the regulator to the low pressure distribution system, and which backed up the low pressure lead of the other tank on back through the regulator of said other tank, a part of which high pressure was released through the safety relief valve of said other tank, and which involved the functional operation of equipment and mechanisms not involved in the routine replenishment of gas supply is not one such as would give rise to a presumption of negligence from the filling of the gas storage tank. The evidence needed to explain how this occurred and proof of what did occur in the system is as available to the plaintiff as to the defendant
*780 The doctrine is not applicable to this case, and not available to the plaintiff for the reason that it was convincingly shown that Mr. Dupuy proceeded to deliver the gas in the usual, customary and approved manner. The procedure used by him employed the accepted and proper technic for the filling and servicing of “tie-in” tanks.
With the doctrine unavailable to the plaintiff, he bears the burden of proving by a preponderance of the evidence that the proximate cause of the high pressure gas escaping into the low pressure distribution system was the negligence of the defendant, General Gas Corporation.
Aside from the fact that evidence of what went wrong in the plaintiff’s gas system being as readily available or obtainable for the plaintiff as for the defendant, the defendant has in fact offered complete and convincing proof of what occurred.
The expert witness, Wharton A. LeBlanc, testified that the effect of the clogged vent on the regulator was to permit high pressure gas to enter the low pressure side of the system. His testimony on this point is :
Transcript, p. 688.
Q. In other words, you found that the vent was plugged ?
A. That’s right.
Q. What affect did that have on the system at the Geismar house?
A. Here is the affect it had: Again, coming from the tank is tank pressure that hits this orifice. Now this regulator, we were using sixty pounds a few minutes ago so we will take sixty pounds; that sixty pounds hits the seat of the regulator which is movable. That is right here (indicating on the regulator).
Q. That is the opening at the top of the regulator?
A. That’s right, the cut-away. Now, as sixty pounds its that seat the diaphragm comes forward, moves upward, and as it moves upward, as you can see, the slide moves against the inlet orifice, again to cut it down to a little over six ounces. Now, it is next to impossible for sixty pounds to hit this seat and the regulator to immediately cut it to eleven inches. So, what they have incorporated on the top side of this — can I back up just a little ?
Court: Yes.
A. This large spring that you are looking at here may be confusing (referring to regulator). That is where you get your eleven inches of water column set. That is pre-set. In other words, to hold this diaphragm back, if you wish, so as to allow eleven inches. Now, on the inside of that large spring you see a smaller heavier spring. That is an internal release valve. Now what happens is any pressure in excess of eleven pounds, eleven inches — ■
Q. That would be six ounces would it not ?
A. A little over six ounces. Any pressure in excess of that would open this release valve and this release valve opened would discharge that gas through this vent to the atmosphere. Under normal operation it is just a little spurt and that’s it. Your regulator has been functioning because the seat had time to position itself against the orifice. Now, you asked me the question, with this plugged what will happen. With this plugged, sir, the gas in excess of the pressured air would be anywhere from twice to three times the setting of the regulator which would be somewhere between twenty-two inches and thirty-three inches. That would be somewhere in the neighborhood of twenty ounces. Any pressure in excess of that, the release valve would open up toward the top side of *781 the diaphragm but due to the fact that this vent is not opening to discharge that your regulator can’t breathe and the diaphragm would be held down. It would not be allowed to rise and there allowing high pressure to go into the system.
Mr. H. Emerson Thomas, also accepted as an expert witness, testified on the same subject, as follows:
Transcript p. 854
* * * * * * .
COURT: I understand that but let’s get to this low pressure gas release.
A. That’s what I’m getting to. Then the next thing, when this high pressure gas get in here, it did push this diaphragm up but at the same time because of this quick surge of high pressure gas it open the low pressure safety relief valve, which is shown on D-14 by the inner spring above the diaphragm, and that allowed high pressured gas to get into the air space with the stoppage at the vent which then meant the malfunctioning of the diaphragm and the regulator which allowed additional high pressured gas to go into the green area and into the piping and tubing to the appliances
Q. Let me see if I understand. You say that because this high pressure went up above into the orange area that it kept the diaphragm depressed down so as to keep it from working back up to 11 inches of water column?
A. It would not allow the regulator to shut off at its normal setting of 11 inches because you had another factor in addition to the spring above the diaphragm. You had the factor of the spring setting plus not an atmospheric pressure, not an atmospheric air situation above the diaphragm, hut you then had an added factor of some pressure gas due to the stoppage. Therefore, you completely change the normal operation—
We are convinced that the trial court committed error in not according the testimony of the expert witnesses, Mr. Le-Blanc and Mr. Thomas, the weight it was entitled to receive, and in substituting therefor its own interpretation of technical data particularly within the scope of the technical specialty of these experts.
 When it is based on sound reasoning and on established facts, the trial court is bound to give proper credit and due weight to opinions and conclusions of experts. This is especially true, as in this instant case, when such testimony is unimpeached, uncontroverted and uncon-tradicted. The opinions of court-accepted experts are to be given great weight in determining the cause and effect of the malfunction of a mechanical device, such as a gas regulator, which involved the interpretation of technical data within the specialty of the experts.
Even if the defendants are to incur the burden of overcoming the inference of negligence, we find that they have succeeded in doing so by a preponderance of the evidence. The irrefutable fact in this case is- that the only physical connection or fixture between the high pressure of the storage tank and the low pressure of the distribution line is the regulator. It was conclusively demonstrated by the explosion itself that high pressured gas gained entrance to the low pressure side of the system, dislodged and unseated the valves and escaped into the kitchen. The conclusion is inescapable that for these events to have occurred, as in fact they did occur, the testimony of the expert witnesses sustained the finding that this was accomplished only through a malfunction of the regulator. Further, it was equally conclusively established that the mere filling of the storage tank in the usual, customary and acceptable manner had no causal connection with the malfunction per se of the regulator.
*782 The trial court, in rejecting the testimony of Mr. Thomas, made this comment:
“After carefully considering the testimony of Mr. Thomas, the court cannot agree that the stoppage was the proximate or primary cause of gas entering the kitchen at an excessive pressure. It was this witness’ conclusion that the stoppage prevented the diaphragm from ‘breathing’ which resulted in the excessive discharge. It must be borne in mind that even though the vent was clogged the excess pressure would have pushed upward against the springs as hereinabove described. This operation is not dependent upon air pressure. The diaphragm breathes when the pressure below the diaphragm is less than 6 ounces. At the time of the filling, there was no appreciable drain by the appliances in the home. The pressure below the diaphragm should have remained at the constant 6 ounces dependent upon the spring tension and not atmospheric pressure. We cannot agree with the defendant that the cause of the malfunction is known. No satisfactory explanation is given as to why high pressure gas entered into the system in the first, place.”
Herein is where the trial court rejected the explanation of both Mr. LeBlanc and Mr. Thomas. The sudden surge of the tank pressure, when Mr. Dupuy cut the reserve tank into the system, caused such a pressure in the lower chamber as to activate the safety relief valve, shown on defendant’s exhibit No. 14 as low pressure safety valve, thus trapping an excessive' pressure in the upper chamber of the regulator which is above the diaphragm. This pressure was trapped because of the clogged vent through which, in normal operation, this excess pressure would be released into the atmosphere. We find that the rejection of the findings of the two experts by the trial court was unwarranted.
We find that the trial court committed error in applying the doctrine of res ipsa loquitur. There is no evidence before us that would justify a holding that General Gas Corporation, or its employee, Earl J. Dupuy, committed any negligent act in the filling of the gas storage tank.
This brings us to a consideration of the question of whether Dupuy owed any duty to plaintiff upon discovering a defect in the gas system, and if so, what this duty was and did Dupuy breach that duty.
We find the trial court observed that “ * * * an employee charged with the responsibility of filling ‘tie-in’ tank under pressure with an inerently dangerous substance should have known of an expected and foreseeable possibility.” This statement of the trial court is in reference to the impossibility of either regulator being adjusted to the identical pre-setting so as to release excess pressure simultaneously. The fault of the system was not that only one of the safety relief valves was in operation, a fact that Mr. Dupuy may or may not have known. The trouble was that the little “spurt” of gas that Mr. Le-Blanc said ordinarily relieved excess pressure was not effective because of the clogged vent. This instantly caused high pressured gas to enter the system, and in so doing, backed up into the regulator of tank Mr. Dupuy was filling, opened the safety relief valve and caused the prolonged hissing sound. This was not an expected and foreseeable possibility. It was, in fact, a most unusual occurrence.
Then the trial court stated, “Mr. Dupuy should have known that with a tie-in system the excess pressure could have been relieved through either regulator. He did know that if he cut both valves the pilot, lights would have been extinguished in the home which would have caused him trouble because of Mr. Geismar’s absence.” If Mr. Dupuy, using the words of the trial court, “should have known that with, a tie-in system, the excess pressure could have been relieved through either regulator” then we are unable to hold that Mr. Dupuy should have known of an expected and *783 foreseeable possibility that high pressured gas would enter the low pressured side of the system, unseated the valves on the appliances in the kitchen resulting in a discharge of gas into that room. If Dupuy could rely on the regulator of either tank to relieve excess pressure, then he had a right to rely on the operation of the safety relief valve on the tank he was filling to take care of excess pressure from the tank that had been on reserve. However, what Dupuy did not know, and a fact he had no way of knowing, was that the air vent on the regulator serving the tank that had been on reserve was clogged.
There is no question that liquefied petroleum gas is an inherently dangerous substance, and must be handled with a care commensurate with its dangerous qualities, however, those who handle such commodities are not insurers of any mishap. Liability attaches only on due proof that the handler violated a duty owed to the person harmed.
The Liquefied Petroleum Gas Commission, a state agency, is by law, charged with regulating the storage, sale and transportation of liquefied petroleum gases, the installation of tanks or system for the use of such gases, and the installation and use of liquefied petroleum gas appliances, makes no requirement that a deliveryman of gas be an engineer or possess the knowledge of an expert in gases. This commission, after examination which he successfully completed, licensed Mr. Dupuy to deliver liquefied petroleum gas. He testified that he had worked in this capacity for General Gas Corporation for eight years and had delivered in excess of 500,000 gallons. Never in his experience had he encountered a situation such as this one. Further, Mr. LeBlanc and Mr. Thomas had no exact experience in their combined service to the gas industry of a period in excess of sixty years.
Plaintiff argues that defendant gas company in dealing in inflammables is charged with the highest degree of care in handling and distributing such products. We certainly have no quarrel with that statement of law. Plaintiff cites the case of Jones v. Blossman (1946) 209 La. 530, 25 So.2d 85. This cited case has no parallel with instant case. In the cited case the defendant installed and serviced a water heater that was enclosed in a very small closet. The defendant instructed the plaintiff to leave the door of the closet open, however, the door was closed for a short time and an explosion and fire resulted. The court found that the heater had been installed in an improper place and the defendant had not used the degree of care which the occasion demanded. There was no improper operation or malfunction of the appliance, but a negligent installation.
Plaintiff cites the case of Hake v. Air Reduction Sales Co. (1946) 210 La. 810, 28 So.2d 441, as applicable to the instant case. In this Hake case, defendant was held liable for the damage done to plaintiff by a defective cylinder of acetylene gas. The court applied the doctrine of res ipsa loquitur. A plug blew out of the cylinder because of a defective core. This was equipment owned, filled, delivered and inspected by the defendant. The court found the defendant negligent in failing to make the necessary inspection of the various parts of the cylinder and in failing to make replacement of defective component parts. There is no parallel here to the instant case.
Further, plaintiff cites the case of Harris Drilling Company v. Delafield (1952) 222 La. 416, 62 So.2d 627, as applicable to instant case. In this cited case, plaintiff sought recovery for damages occasioned when defendant’s large truck ran off the turnaround at a drilling site. When the truck ran off the turnaround it broke a butane gas line that was exposed on the ground which resulted in a fire that caused damage to plaintiff. Court held defendant negligent for running or driving off turnaround and breaking pipeline and also held plaintiff was contributorily negligent in *784 leaving the pipeline exposed on top of the ground, knowing that trucks were sometimes driven off the turnaround. Court held that plaintiff was negligent in laying the line, exposed, in close proximity to the wooden platform. Again we find no analogy to case before us herein.
The deliveryman herein in handling the highly inflammable butane gas is charged with a high degree of care. Even so, in delivering the gas from the tank truck to the storage tank he is not responsible for the consequence of a defect in the plaintiff’s gas system of which he had no knowledge or control.
If this defective equipment, the regulator, belonged to the defendant gas company instead of the plaintiff, we would have no hesitancy in finding defendant gas company negligent. The gas company would be responsible for not adequately inspecting and maintaining their equipment. It would be their duty to do so. Equally so, the plaintiff is charged with the same duty as the defendant because the equipment belonged to the plaintiff and it was his obligation to maintain his own equipment. In that sense, the plaintiff, too, was handling a highly inflammable and explosive product and must exercise a high degree of care in the maintenance of his equipment.
Or, if the defect in the regulator was obvious and was seen or should have been seen by defendant gas company’s employee, the responsibility would rest heavily on the defendant. This is not the case before us. The equipment was the property of the plaintiff, and the plaintiff aloné had the obligation of maintaining it in a safe condition.
In Kendall et al. v. People's Gas & Fuel Co. (1935) 158 So. 254, an action against the gas company for recovery of value of trees allegedly killed by escaping gas, the court said, at page 257:
“[3, 4] Under the law, a gas company is not an insurer against damage or injury from the escape of gas from its pipes, unless such an obligation is imposed in its franchise. Annotation, 25 A.L.R. 265.
“As defendant is held to no such responsibility by its grant, it is only liable for its negligence. The degree of care required of it is well expressed in the case of [Koch] v. Southern Cities Distributing Co., 18 La.App. 664, 138 So. 178, 182, as follows: ‘Natural gas is a dangerous agency. Its distribution is accompanied by. many possible dangerous consequences, and it is therefore well established that a higher degree of care and vigilance is required in dealing with such agency than is required in the ordinary affairs of life. A degree of care commensurate to the danger involved is required of a distributor of natural gas to avoid injury and damage and, in case of failure to exercise such care, and injury results, it is liable.’ ”
Thus the obligation enunciated supra, imposed on the distributor of gas is the same obligation that rests upon the homeowner who owns and maintains his own equipment to be certain that it is in good operating condition.
In Loyocano v. Louisiana Power & Light Co. (1936) La.App., 165 So. 515, the plaintiff sued to recover damages he suffered in an explosion caused by gas. The system within the premises of plaintiff had uncapped gas outlets. The court stated on page 519:
“[2] There have been called to our attention many decisions concerning the fixing of responsibility for damages sustained as a result of uncapped gas pipes within the confines of a building, and we conclude that the better rule is that the furnisher of gas is in no way concerned with the condition of the pipes or appliances inside the premises of a customer, in the absence of knowledge of defects or in the ab *785 sence of circumstances which might indicate that the pipes are open and that it would he dangerous to turn gas into them.”
Plaintiff contends that Dupuy was negligent for cutting off the gas supply knowing that all pilot lights would be extinguished, that this action would create a dangerous situation within the house; that Dupuy made no attempt to inform any of plaintiff’s employees that the supply of gas to the house had been extinguished, nor did he try to gain access to the house to air same, nor did he give warning of the danger created initially by his opening the tank valves in order that some action could be taken to rid the house of gas.
In the first place, Dupuy did not have knowledge prior to the explosion that gas had escaped into the house. As to the other contention of plaintiff, assuming for the sake of argument that these were negligent acts of Dupuy, there is no causal relationship between these alleged acts and the end result. In order for Dupuy or his employer to be liable, there must exist a causal relationship between the acts complained of and the results thereof. There is no possible causal relationship between Dupuy cutting the gas off from the house and the explosion that occurred some few minutes later. It is considered a preventive act rather than a causative act.
Plaintiff cites the case of Surry v. Arkansas Louisiana Gas Company (1965) La. App., 170 So.2d 133. In that case the defendant gas company, knowing that an uncapped outlet existed within the plaintiff’s residence, turned the gas off without either notifying the plaintiff or securing the gas cut-off in an off position. The court held defendant liable for resulting damage when plaintiff turned the gas on without knowledge that there was an uncapped outlet through which gas could escape. In the case before us, the facts are entirely distinguishable. The cited case is not controlling of the instant case.
Plaintiff concludes from certain testimony quoted in brief that Dupuy admitted that he knew gas was escaping into the house. We have carefully reviewed this testimony and find that nowhere therein does Dupuy make any such admission. He testified that “ * * * After you turn the valve on, the gas went in the house and there wasn’t a way in the world for me to stop it in the house.” We are persuaded by a consideration of his whole testimony on this subject that when he was saying “gas went in the house” he meant that it went in the house in the pipes, not escaping from the pipes. Nowhere does he say that he knew gas was escaping from pipes in the house. To hold otherwise, would be an unreasonable extension of his testimony.
Dupuy did what we believe the reasonable prudent man would have done when he sensed that something was wrong with the plaintiff’s gas system. He cut everything off. He cut off both tanks of the system, stopped delivering gas, and called his superior for help. He has been criticized by the trial court for cutting off the service knowing that there was a pilot light on the stove and on the water heater. We find that he acted prudently and cautiously in cutting off the gas. He was criticized for not opening up the Geismar kitchen prior to the explosion to permit the dissipation of the gas collected therein. Dupuy had no knowledge that gas had escaped from the system, except through the safety relief valve on the tank he was filling.
The actions required of Dupuy must be judged in the light of the circumstances that existed at the time of the trouble. In retrospect, it is usually not difficult to point out what should have been done. The duty owed to plaintiff was to do whatever was necessary to cause the system to become non-operational and seek the aid and help of expert assistance through his superior. This he did when he cut both tanks off and called his superior for help.
*786 For the foregoing reasons, the judgment •of the trial court is reversed and the demands of the plaintiff rejected at his cost.
Reversed.