The application is denied. This Court will not interfere with the orderly procedure and trial of causes pending in the lower Courts of this State, save and except when the ruling complained of is palpably erroneous, and then only when it appears that irreparable injury will ensue. No such showing is made in this case.

166 So.2d 252

**HOME GAS & FUEL CO., Inc., et al.**

**v.**

**MISSISSIPPI TANK CO., Inc., et al.**

**No. 47024.**

July 1, 1964.

Polk, Foote & Neblett, by William P. Polk, Stafford & Pitts, by John L. Pitts, Alexandria, for plaintiffs-appellants.

George J. Ginsberg, Alexandria, Dudley W. Conner, Hattiesburg, Miss., for defendants-appellees.

SUMMERS, Justice.

The plaintiff, Home Gas & Fuel Co., Inc., and its insurers, Travelers Insurance Company, Commercial Standard Insurance Company and Stuyvesant Insurance Company, instituted this suit against Mississippi Tank Co., Inc., and its insurer, New Amsterdam Casualty Company, to recover damages incurred by plaintiffs due to fire which resulted from the accidental discharge of gas from a propane-butane truck tank of Home Gas & Fuel Co., Inc. The claim is based upon the negligence of Mississippi Tank Co., Inc., in failing to equip the tank sold to Home Gas & Fuel Co., Inc., with a protective excess flow valve.

The trial court was of the opinion that plaintiff, Home Gas & Fuel Co., Inc., was contributorily negligent and that the failure of Mississippi Tank Co., Inc., to install the excess flow valve was not a proximate cause of the damage. On this basis recovery was denied to plaintiffs.

In the court of appeal this judgment was affirmed.

Home Gas Company ordered a 1400-gallon propane-butane delivery unit tank from Mississippi Tank Company on June 22, 1960, to be manufactured and installed upon a truck chassis to be furnished by Home Gas Company. The order specified that the tank was to be provided with "all basic tank fittings" and a two-inch "Okadee" valve. Mr. Lagrange, then President of Home Gas Company, placed the order for the tank with Mississippi Tank Company because he had seen a sample of one in a Liquefied Petroleum Convention show in Chicago; and he was impressed with the fact that the Mississippi Tank Company installed its excess flow valve inside of the tank and protected this valve with a "companion flange" assembly so that the excess flow valve could not be damaged if the truck were involved in an accident. No serious question is presented as to whether the order contemplated the installation of the excess flow valve, for an employee of Mississippi Tank Company testified that he installed the valve.

After the tank was mounted on the truck, the truck was taken to Home Gas Company's plant in Lake Charles, where additional fittings were installed downflow from the Okadee valve and the truck placed in service.

On November 20, 1960, while engaged in a delivery to a customer, the discharge pump, its mounting and the hose which connected it to the main discharge valve, all located on the underside of the tank, were damaged when the truck fell into a culvert. The truck was brought to the Woodsworth plant of Home Gas Company for repairs.

The next day, November 21, 1960, the damaged truck was brought inside of Home Gas Company's wood and sheet metal building used as a shop for maintenance and repair of trucks. This structure had large doors on one end and small openings, con-

sisting of windows and doors, on the other three sides. At this time the truck contained approximately 842 gallons of a mixture of propane and butane liquefied petroleum gas.

Two employees proceeded to make the required repairs. This consisted of straightening the metal mounting holding the pump under the tank and replacing the hosing connecting the Okadee valve to the pump, because the hose had developed a bad "kink" as a result of the accident. The Okadee valve is the main or master discharge valve *at* the tank from which the hose conveys the liquid gas to the pump, which, in turn, supplies another hose through which deliveries are made to customers. Upflow from the Okadee valve, which is attached to the tank proper by flanges, and within the tank, the excess flow valve is designed to be located. If properly installed it should serve to check any excess flow from within the tank to the Okadee valve.

At the time of the accident in question, the pump had been removed and the two men were in the process of replacing the bad hose. To do this it was necessary to disconnect it from the Okadee valve. One of the employees, Jones, in an effort to uncouple the hose from the Okadee valve with wrenches, inadvertently forced the handle on the valve open; it jammed and could not be closed.

When the Okadee valve was opened the propane-butane mixture gushed forth from the opening in vapor form with great force. The force was so great that a loud roar was heard and Jones, who was under the truck, was knocked about eight feet, or under the front wheels of the truck. However, both employees escaped from the building which immediately filled with a dense cloud of gas; the gas then poured outside the building covering the area generally.

One of the employees, Hearn, after assisting Jones to extricate himself from under the truck, dashed next door to a pine cone drying factory where electrically controlled drying kilns were used. He threw the master switch, cutting off the fires, and warned the employees there to evacuate. Hearn then went to the office building of Home Gas Company nearby to warn other employees and afterward returned to the shop area where the truck was located.

The fire started shortly thereafter outside the building about twelve feet from its entrance. Its definite origin is not disclosed by the record. However, there were some plausible explanations advanced for its being set off, such as a number of electrical motors and switches in and around the buildings involved, which could have served as ignition agents and which were not controlled by the master switch which Hearn had turned off. The fire enveloped the shop building and the adjoining pine cone drying

factory building, causing the damages for which recovery is sought.

It was not until November 23rd that the debris of the fire cooled sufficiently to permit an inspection of the tank truck. Inspection disclosed that the excess flow valve had not been installed in the tank.

This excess flow valve has as its sole purpose the automatic cutting off of the gas flow when the flow through the valve exceeds a given number of gallons per minute. The prime reason for its installation in the tank opening is to prevent the escape of gas from the tank when there is a failure of the other valves or hose downflow from the tank opening. It is a safety measure.

Although an employee of Mississippi Tank Company testified that the valve had been installed, we are convinced that it was not. All courts have agreed on this finding.

Inspection of other delivery tanks which had been acquired by Home Gas Company from Mississippi Tank Company revealed that the excess flow valves which had been installed in those units did not operate and it was necessary to replace them with other valves of suitable design.

The dangerous nature and hazardous character of liquefied petroleum gases has been recognized by the constitution and laws of this State and provision has been made for the regulation of its use in the interest of "public safety". LSA–Const.1921, art. 6, § 28; LSA–R.S. 40:1841 et seq.

Moreover, the jurisprudence of this State has recognized the greater and higher than ordinary degree of care demanded of those involved in the manufacture, preparation and distribution of propane-butane gas and similar products. Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963); Harris Drilling Co. v. Delafield, 222 La. 416, 62 So.2d 627 (1953); Hake v. Air Reduction Sales Co., 210 La. 810, 28 So.2d 441 (1946); Jones v. Blossman, 209 La. 530, 25 So.2d 85 (1946).

■ The Rules and Regulations of the Louisiana Liquefied Petroleum Gas Commission published in accordance with Acts 63 and 563 of 1950 require that "connections to containers * * * shall be provided with *suitable* automatic excess flow valves", and these valves are required by those regulations to be tested and listed by Underwriters' Laboratories, Inc., or approved by the Director of the L. P. Gas Commission. Neither of these requirements was met by the Mississippi Tank Company.

The regulation requiring the installation of an excess flow valve is sanctioned by law. It is a regulation designed to protect the public safety. The violation of its provisions is negligence *per se,* and this negligence is actionable if it was a legal cause of the fire and the damages which ensued. Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).

To be actionable the cause need not be the sole cause, but it must be a cause in fact, and to be a cause in fact it must have a proximate relation to the harm which occurs and it must be substantial in character.

Undoubtedly Mississippi Tank Company's failure to install the excess flow valve as required by law was a substantial factor in the cause of the fire and destruction. The effect of this negligent omission continued to the very moment of the act complained of—the uncontrolled release of the gas, the resulting fire and destruction. But for the serious omission of a "suitable" excess flow valve on the part of Mississippi Tank Company, the damage would not have occurred, for a "suitable" valve as required by the regulations would have functioned and provided the intended protection.

The defense is concerned mainly with the contention that even if the excess flow valve had been installed it would not have worked for one of several reasons: (1) It may have become "fouled" or "frozen'" by scale from the interior of the tank or foreign matter in the liquid gas; (2) the lever of the Okadee valve was not opened enough to permit a flow rate which would activate the excess flow valve and close it; and (3) the excess flow valves on the other tanks tested did not work.

Answering these contentions in the order listed, first, it cannot be assumed that the valve would have become "fouled" or "frozen" for it was not even installed. One

of the other excess flow valves removed from another tank supplied by Mississippi Tank Company was not "fouled" or "frozen" by foreign substances when inspected.

Secondly, the contention that the Okadee valve had not been opened enough to permit the excess flow valve to work is amply refuted by the clear and preponderant evidence of the force of the flow of the gas (the roar and shoving Jones eight feet away) and the rapidity with which it spread and filled the shop. We are convinced this would not have occurred if the valve had been "suitable" as required by the regulations. A "suitable" valve would have to be designed to provide safety against just such a situation as occurred here. It is difficult to conceive a more striking factual situation requiring the need of such a valve.

And, finally, it is no aid to the defendants to say that because the other valves they installed in the other trucks did not work, the one installed in the truck involved in this incident would not work also. Compounding their error affords them no relief. What the law and regulations require is a valve that will work. Mississippi Tank Company was aware of the equipment in use by Home Gas Company, the discharge pump's rate of flow, the outlet hose orifice, etc., and it was incumbent on them to supply a valve which would function under the practical realities for which it was required.

The defendants have urged us to relieve them of liability herein, for, as they contend,

even if the excess flow valve had been in place it would not have been activated by the gas flowing through it, for the flow was not of sufficient volume. Of course, we have found differently on this point. Our finding is that the initial surge of gas was of more than sufficient volume and force to activate a "suitable" excess flow valve. But, otherwise, the flaw in defendant's argument is that it deals in suppositions. To begin with there was no excess flow valve installed and the facts on which they would have us base our conclusion did not exist.

■ We think it sufficient to say in answer to this latter contention that when the negligence of the defendant greatly multiplies the chances of harm to plaintiff, and is of a character naturally leading to its occurrence, "the mere possibility that it might have happened without the negligence is not sufficient to break the chain of cause and effect between the negligence and the injury." Reynolds v. Texas & P. Ry. Co., 37 La.Ann. 694 (1885).

The defendants have urged with emphasis the contributory negligence of the plaintiff Home Gas Company. The plea was upheld by both the trial court and court of appeal and is grounded upon these contentions: (1) Undertaking the repairs to the tank truck without emptying the tank of the highly inflammable, explosive and gaseous contents; (2) fouling and opening the lever of the Okadee or master valve in an unworkmanlike and negligent manner; (3) conducting the repair operation on a loaded tank inside a building; (4) failure to remove the handle from the Okadee valve before commencing work on the coupling connected therewith; and (5) performing the work in close proximity to industrial motors.

■ It was negligence for Home Gas Company to attempt the repairs on the loaded tank inside the building in close proximity to other buildings and ignition agents such as electrical motors. The testimony is unequivocal and almost unanimous that it is a breach of safety precautions to do so. The tank should have been emptied before entering the building, as the evidence establishes it could have been, or, the repairs should have been undertaken in an open area away from buildings and possible ignition agents. As the trial judge remarked, "experts are not required to convince us of the soundness of that conclusion." We think this negligence contributed to the harm complained of and is sufficient to bar plaintiff's recovery but there was other negligent conduct which contributed to the fire and damage.

■ The handle on the Okadee valve could have been removed by simply unscrewing a nut and removing a small bolt which joined the handle to the valve. This would undoubtedly have minimized the chances of jamming the valve open as happened in this case. This precaution was not taken.

We are of the opinion, too, that Home Gas Company should have checked their equip-

ment to ascertain if the excess flow valve was functioning before placing the equipment in service. This they failed to do.

We agree with the trial court and the court of appeal that plaintiff Home Gas Company was also negligent, and that this negligence, combined with the negligence of the Mississippi Tank Company, contributed to and caused the fire and destruction. See Theunissen v. Guidry, 244 La. 631, 153 So.2d 869 (1963); D & D Planting Co. v. Employers Casualty Co., 240 La. 684, 124 So.2d 908 (1960).

For the reasons assigned the judgment is affirmed.

HAMITER, J., concurs in the result.