402 So.2d 90 (1980)
Christopher KNOCKUM et al.
v.
AMOCO OIL COMPANY et al.
Claiborne WHITE, Jr. et al.
v.
AMOCO OIL COMPANY et al.
Nos. 13836, 13837.
Court of Appeal of Louisiana, First Circuit.
December 15, 1980.
On Rehearing June 29, 1981.
On Rehearing July 27, 1981.
Rehearing Denied August 25, 1981.
*93 Alfred F. McCaleb, III, Baton Rouge, Malcolm J. Dugas, Jr., Joffrion & Dugas, Donaldsonville, John A. Lieux, Gonzales, for plaintiffs and appellees.
A. Shelby Easterly, III, Taylor, Porter Brooks & Phillips, Baton Rouge, for defendants and appellants Amoco Oil Co. and Aetna Cas. & Surety Co.
Charles F. Castille, La. Health & Human Resources Adm., Baton Rouge, for intervenor and appellee.
Harry P. Gamble, III, Gamble & Gamble, New Orleans, for defendant and appellant Bernice Holmes.
Before COVINGTON, CHIASSON and LEAR, JJ.
CHIASSON, Judge.
Defendants-Appellants, Amoco Oil Company and Aetna Casualty & Surety Company (sued as Aetna Insurance Company), appeal the separate judgments rendered against them and in favor of the appellees for damages awarded to appellees for personal injuries and wrongful death actions sustained in a gas explosion and house fire in Prairieville, Louisiana.
Two separate suits were filed in this matter and consolidated for trial purposes. A brief review of the facts will aid in the determination of the respective parties and their claims.
On May 5, 1975, Christine Wenzy and her two minor children, Amy (then age three) and Jerome (then age two), were moving into a two bedroom wood frame house in Prairieville. The house was owned by Bernice Holmes, a resident of New Orleans, who had given a key to the house to Christine. There is some dispute as to whether Christine Wenzy was actually going to rent the house or whether she had permission to use the house, but this is not vital to our determination.
Helping Christine to move was Diane Knockum who had her daughter, Susan, with her. Shirley Ezeff White, who had been living with Christine in a house across the road from the one in question, was also helping. Finally, Christine Wenzy's brothers, Albert Wenzy and Michael Wenzy, along with Willie Robinson, aided in the venture.
The house had previously been rented to Ms. Emma Frazier who had moved at least two weeks (others testified that it was longer) prior to the move by Christine. Ms. Frazier had lived in the house less than a year and had it serviced for propane gas by one of the defendants, Amoco Oil Company.
The move began sometime in the afternoon on May 5 and concluded close to dinner time. At that time, Albert Wenzy connected the gas stove they had brought into the house to the gas connection in the kitchen. Albert and Christine turned on the gas from the propane tank located outside and in the back of the house. During this time, the three children were seated at the dinner table with the others gathered in the living room. Christine Wenzy then went to the back bedroom and proceeded to open the door. At that moment an explosion occurred followed by a fire which engulfed the house.
Injured in the blaze, but surviving, were Christine Wenzy and Susan Knockum. Amy and Jerome Wenzy, Diane Knockum, and Shirley Ezeff White survived the fire but later died of burns to their bodies. None of the three males were injured in the accident.
Two suits were filed in this matter, the first by Christopher Knockum, husband of Diane Knockum; Willie D. Williams, alleged natural father of Amy and Jerome *94 Wenzy; and Christine Wenzy. The plaintiffs sued Amoco Oil Company, its liability insurer, Aetna Casualty & Surety Company, and Bernice Holmes, owner of the house.
Christopher Knockum sued for the wrongful death of his wife, Diane, and for the pain and agony she suffered before dying on June 16, 1975. In addition, Christopher is suing as natural tutor of his daughter for the injuries she sustained as well as for the wrongful death of her mother and the pain and agony her mother sustained before dying.
Willie D. Williams, the alleged natural father of Jerome and Amy Wenzy, is suing for their wrongful deaths in addition to damages for the pain they suffered prior to their deaths on May 6, 1975, and June 9, 1975, respectively.
Christine Wenzy is suing for the wrongful deaths of her two children, Jerome and Amy, as well as damages for the pain they suffered prior to their deaths. Christine is also seeking damages she incurred as a result of the fire.
The second suit is by the survivors of Shirley Ezeff White. Her husband, from whom she had been judicially separated, Claiborne White, Jr., sued on his behalf for the medical and funeral expenses incurred by the death of Shirley. In addition, he sued as natural tutor of the five minor children born of the marriage for the wrongful death of their mother and the pain and suffering she experienced before dying on May 15, 1975.
Named as defendants in the second suit were Amoco Oil Company, Aetna Casualty & Surety Company, Bernice Holmes, Emma Frazier, Albert Wenzy, Michael Wenzy, and Willie Robinson.
The State of Louisiana, through the Department of Health and Human Resources Administration, intervened in the first suit seeking reimbursement of $9,806.09 for medical expenses incurred by them in caring for Christine, Jerome and Amy Wenzy at the Charity Hospitals in Baton Rouge and New Orleans.
The trial court, after two days of testimony and taking the case under advisement, rendered judgment, without assigning written reasons, in favor of all plaintiffs. In the first suit, all three defendants were held, in solido for the following awards:

Christopher Knockum  $100,000 for the wrongful death
individually of his wife, Diane
 Knockum.
 35,000 for damages sustained
 by his wife.
Christopher Knockum  40,000 for the wrongful death
as tutor of Susan of Susan's mother,
 Diane Knockum.
 35,000 for damages sustained
 by her mother.
 700,000 for damages sustained
 by Susan.
 ________
 $910,000
Willie D. Williams  $ 40,000 for the wrongful death
 of Jerome.
 5,000 for damages sustained
 by Jerome.
 40,000 for the wrongful death
 of Amy.
 5,000 for damages sustained
 by Amy.
 ________
 $ 90,000
Christine Wenzy  $180,000 for damages sustained
 by Christine.
 40,000 for the wrongful death
 of Jerome.
 5,000 for damages sustained
 by Jerome.
 40,000 for the wrongful death
 of Amy.
 5,000 for damages sustained
 by Amy.
 _______
 270,000

In addition the three defendants were cast, in solido for $9,806.09, the amount owed to the intervening State, as well as for all court costs, expert fee in the amount of $750.00, and interest in the amount of seven percent (7%) for all sums awarded.
In the second suit, judgment was rendered on the same day against Amoco Oil Company and Bernice Holmes, in solido. The awards to Claiborne White, Jr. were as follows:

As tutor of children  $200,000.00 ($40,000 for each
 child) for the wrongful
 death of their mother,
 Shirley Ezeff White.
 25,000.00 ($5,000 for each child)
 for the damages sustained
 by their mother.
Individually  1,389.45 medical and funeral
 expenses.
 ___________
 $226,389.45

In addition, the defendants were to pay for all court costs, expert fee in the amount *95 of $750.00, and interest at the rate of seven percent (7%) for all sums awarded.
Amoco Oil Company and Aetna Casualty & Surety Company obtained a timely suspensive appeal and timely posted an appeal bond on May 8,1980. The other defendant, Bernice Holmes, obtained an order for a devolutive appeal on June 17, 1980.
In regards to this latter appeal, we find that it is untimely and therefore we dismiss the appeal for lack of jurisdiction over the matter. Therefore, the judgment of the trial court as it relates to Bernice Holmes is final.
The judgments of the trial court were rendered on March 14,1980. Notices of the judgments were sent out by the Clerk of Court of Ascension Parish on April 3, 1980. The time frame applicable for a new trial was seven days which expired on April 15, 1980. (La.C.C.P. art. 1917). The thirty day delay for a suspensive appeal ended on May 15, 1980 (La.C.C.P. art. 2123), while the sixty day delay for a devolutive appeal ended on June 16, 1980. (La.C.C.P. art. 2087). Ms. Holmes did not obtain her order for appeal until June 17, 1980. Her appeal is therefore untimely. We are without jurisdiction and dismiss her appeal at her costs. (La.C.C.P. art. 2088).
Appellants, Amoco and Aetna, enumerated five specifications of error, but we need only concern ourselves with three of the five.
1. The trial court committed manifest error in failing to find the liquefied petroleum gas was properly odorized.
2. The trial court committed manifest error in failing to find Amoco free from fault causing or contributing to the alleged explosion and fire complained of by plaintiffs.
3. The trial court committed manifest error in failing to find plaintiffs (and their decedents) at fault causing the alleged explosion and fire complained of by plaintiffs.
Since the trial court did not provide written reasons for judgment, we are left to surmise the factual findings of the trial court for rendering the judgment it rendered.
During plaintiffs' case, they have advanced two main theories of recovery, both based on the negligence of the defendants. The first is based on numerous violations of the 1974 Edition of the Rules and Regulations of the Liquefied Petroleum Gas Commission (LPG) as it relates to the servicing of improperly installed gas systems. The second contention is that Amoco failed to put a sufficient amount of odorant in the propane gas that was delivered to the house so that its presence in the house could have been detected.
Concerning this second contention, we find that the propane gas that was in the tank and which was supplied by Amoco Oil Company was properly odorized. If the trial court found this to be a duty that was breached by the defendants, we hold that this is manifestly wrong and reverse.
From the records of Amoco Oil, which were introduced into evidence, four deliveries were made to the house in which Emma Frazier was residing. The first was made in December of 1974, and the last delivery was in March of 1975. The shipping receipts from the Brittany distribution plant showed the amount of malodorant present in the propane. The amount was of sufficient quantity under the Rules and Regulations of the LPG Commission. See Davis v. Aetna Insurance Company, 291 So.2d 486 (La.App. 3rd Cir. 1974).
The Brittany Plant was the place of origin of the propane that was delivered to Emma Frazier in March of 1975. The record does not reflect any other propane being delivered to the house since that time.
In addition to this evidence, four witnesses testified that after the explosion, they had an opportunity to smell the gas that remained in the tank and actually did smell the propane. Of the four witnesses, two were chemists contacted originally by the plaintiffs to run tests on samples of the propane to determine if there was a sufficient amount of odorant in the propane.
Mr. Delbert A. Covington testified that he conducted a test that diluted the propane *96 gas with air but could not tell the actual percentage of odorant present in the propane. He did state that he could smell the gas, though it was not very strong.
William Marvin Welsh, who worked for Shilstone Testing Laboratory, Inc. of New Orleans, went to Prairieville to take samples of the gas. He stated that he could smell the propane in his car on the way back to New Orleans. In addition, after diluting the propane in his laboratory, he asked five other persons present in the lab if they could detect an odor, and all five of them agreed that they could.
Plaintiffs' main argument is premised on the fact that Amoco failed in its statutory duty by servicing the house with an improperly installed gas system or one that was in a dangerous condition. Their contention is based on the following section of the Rules and Regulations of the LPG Commission:
"5.14 Transfer of Liquids
(h) Must Not Serve Illegal Installations: Bonded dealers must NOT SERVE any liquefied petroleum gas containers INSTALLED ILLEGALLY in the State of Louisiana or posted by the Liquefied Petroleum Gas Commission. Ignorance will not be accepted as an excuse, as it is the duty of the dealer to investigate before serving any doubtful liquefied petroleum gas container.
(i) Must Not Serve Improperly Installed System: Bonded dealers must NOT SERVE any liquefied petroleum gas system which, upon investigation, is found to be IMPROPERLY INSTALLED or which is in a dangerous condition."
It is contended that the gas system was improperly installed or at least in a dangerous condition because of the following violations of the Rules and Regulations of the LPG Commission. They include: (a) Improper placing of the tank within ten feet of the building; (b) Supply lines not buried to the proper depth; (c) No cutoff valve provided at the outside of the building; (d) No drip provided at the installation; (e) Piping was not properly graded; (f) Piping was not properly supported; (g) No shutoff valve provided at each appliance; and (h) Two uncapped lines in the house.
These violations were found to have existed after the explosion and fire by Lionel Ortego, Director of the LPG Commission. Based on these violations and the servicing of the system by Amoco, plaintiffs are contending that the defendants were negligent per se in accordance with the case of Home Gas & Fuel Co. v. Mississippi Tank Co., 246 La. 625, 166 So.2d 252 (1964).
It was stated by a number of witnesses, including Mr. Ortego, that of all the violations the last one was the actual cause of the explosion and fire. The presence of two uncapped gas lines in the house was the cause of the explosion and fire.
Since the cause of the explosion and fire are known, we need to determine whether the defendants had any responsibility for that cause.
Ms. Frazier notified Amoco back in December of 1974 that she wanted gas service. She was initially turned down since she did not have her appliances hooked up. Eventually, Cecil Harrington, a route salesman for Amoco, went to the house for the purpose of servicing it. He made an initial inspection of the house checking for gas leaks in the lines as well as for proper hookup of the appliances. Finding everything to his satisfaction, he supplied the propane gas.
At the time of his inspection, there was present in the house a kitchen stove, a hot water heater and two space heaters. All were gas appliances supplied by the propane tank located outside. A gas line was also present in the bathroom but it had been capped.
After four months of service to the system with the last supply of propane coming in March of 1975, Ms. Frazier vacated the premises. Amoco did not come into further contact with the system. Ms. Frasier, upon leaving the premises, took her two space heaters that were located in the back bedroom and in the dining room.
*97 The two heaters were supplied with propane from the same gas line. The line had a T-connection with one end of the connection protruding into the bedroom while the other supplied gas to the dining room. After the gas heaters were removed, no caps or plugs were placed on the open ends of the line.
Our resolution of this case will depend on the duty/risk analysis that the Supreme Court has set forth in a number of cases. Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Laird v. Travelers Insurance Company, 263 La. 199, 267 So.2d 714 (1972); Boyer v. Johnson, 360 So.2d 1164 (La.1978); and LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978).
Although the factual situation is different, the Laird decision gives a detailed analysis of the Court's function under the duty/risk approach:
"We have repeatedly held that a criminal violation would lead to civil responsibility only if that act is the legal cause of damage to another. To decide whether the violation of the criminal statute by Laird imposes civil liability upon him and denies him civil redress from one admittedly negligent, we must determine whether his act was a cause-in-fact of the accident, what was the nature of the duty imposed upon him, what risks were encompassed within that duty, and whether under the combination of these considerations he should be declared negligent." Laird, supra, 267 So.2d p. 717.
We must determine what the duty on Amoco was and determine whether it was breached by some actions or omissions. The duty in this case was the statutory duty imposed on dealers and distributors of gas to inspect the premises for violations of the Rules and Regulations of the LPG Commission before servicing the system with the propane. In particular, the plaintiffs cited the following provision pertaining to the requirement of shutoff valves:
"5.9 Container Valve and Accessories
(a) Shut-Off Valves: All shut-off valves and accessory equipment (liquid or gas) shall be suitable for liquefied petroleum gas service, and designed for not less than the maximum pressure to which they may be subjected. Valves and accessories which may be subjected to container pressure shall have a rated working pressure of at least 250 pounds per square inch gauge.
(b) 3. Any appliance connected to a piping system shall have an accessible manual shut-off valve installed upstream of the union or connector, and within six (6) feet of the appliance it serves."
See Home Gas & Fuel Co. v. Mississippi Tank Co., supra, and Carlysle v. Aetna Insurance Company, 248 So.2d 64 (La.App. 1st Cir. 1971).
Another inquiry when a court decides on the duty is whether the duty encompasses the risk that is involved as well as the party that is injured. As stated in the case of Geismar v. General Gas Corporation, 182 So.2d 769 (La.App. 1st Cir. 1966):
"There is no question that liquefied petroleum gas is an inherently dangerous substance, and must be handled with a care commensurate with its dangerous qualities, however, those who handle such commodities are not insurers of any mishap. Liability attaches only on due proof that the handler violated a duty owed to the person harmed."
The rules and regulations of the LPG Commission were designed in the interest of public safety. La.R.S. 40:1846. We deem that these plaintiffs, although not fully classified as lessees, would be encompassed within this duty imposed on the defendants. Carlysle v. Aetna Insurance Company, supra. Surry v. Arkansas Louisiana Gas Company, 170 So.2d 133 (La.App. 2nd Cir. 1964), but see Huggins v. Hartford Accident and Indemnity Co., 271 So.2d 876 (La.App. 4th Cir. 1973).
Notwithstanding this duty, the flaw in plaintiffs' case is that they have failed to prove that the actions of the defendant, Amoco Oil, were a cause-in-fact of the explosion *98 and fire which led to the injuries and damages sustained by the plaintiffs.
The violation of statutory requirements imposed on the distributors does not impose liability on them without some showing that these violations contributed to or actually caused the damage complained of. As was stated in the Dixie Drive It Yourself Sys. case, supra, 137 So.2d page 302: "Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm." The statement was clarified in the Laird decision, supra, 267 So.2d pages 717 & 718:
"We determine only whether it was a substantial factor without which the accident would not have occurred that is, whether it had some direct relationship to the accident."
We need to examine the violations of the regulations of the LPG Commission to determine if any of these violations had a direct relationship to the accident. Mr. Ortego testified that all of the violations were minor and in no way contributed to the accident except for the open gas lines. He stated, along with other witnesses, that the presence of open gas lines in the house was the cause of the plaintiffs' damages.
Plaintiffs' argument is that Amoco failed in its duty by not requiring shutoff valves on those lines before it serviced the system with propane. They contend if these lines had been equipped with shutoff valves then, when Christine and Albert Wenzy turned the propane on, the shutoff valves would have prevented the gas from escaping into the room.
The problem with this argument is twofold. First, plaintiffs did not prove there was no shutoff valves present at the space heaters when Mr. Harrington made his inspection of the system. The only testimony concerning the valves was that of Mr. Harrington which was inconclusive. He stated that he did not remember if there were shutoff valves present or not, but that all the lines had either appliances or were capped so that there were no open gas lines.
Secondly, as Mr. Ortego explains: "In almost every case, whoever moves out takes the gas cock (shutoff valve) and everything with them." (Explanation ours). In this regards, Ms. Frazier corroborated by her sister, Blanche Honore, testified that they visited the house on the afternoon of May 5, 1975. Their testimony is to the effect that Ms. Frazier pointed out the open gas lines to Christine Wenzy and told her that they needed to be capped before turning on the gas.
Mr. George Pappas, an expert on cause and prevention of fire and explosion called by the plaintiff, stated that when he inspected the house in August of 1979, he found a capped line in the bathroom, two uncapped lines in the bedroom and dining room. He also found a gas stove which had the required shutoff valve and a hot water heater which also had a shutoff valve.
We feel that the plaintiffs have failed in their burden of proof of proving that the actions of Amoco were a cause-in-fact of the explosion and fire. Their actions in inspecting the system might have resulted in minor violations of the Rules and Regulations of the LPG Commission but in no way were they a substantial factor in bringing about the accident.
The gas system had worked without incident the four or five months that Ms. Frazier had used it while being serviced by Amoco. The actions of Ms. Frazier in removing the space heaters, the failure of Bernice Holmes to carefully inspect the house before leasing the premises, as well as the actions of the plaintiffs in using the gas system without proper assistance could have all been the actual cause of the accident. Plaintiffs have not shown that Amoco failed in detecting open gas lines in the house when it made its inspection, presumably because it did not exist at that time.
We only hold that the acts or omissions of the defendant, Amoco Oil Company, were not a cause-in-fact of the accident.
For the foregoing reasons, the judgment of the trial court in case numbered 13,836 is reversed in as much as it held the defendants Amoco Oil Company and Aetna Casualty & Surety Company, liable for the damages *99 sustained by the plaintiff. The judgment as it relates to Bernice Holmes has become final for failure to appeal timely and her appeal is dismissed. The judgment of the trial court in case numbered 13,837 is also reversed in as much as it held the defendant Amoco Oil Company, liable for damages sustained by the plaintiffs. The judgment as it relates to Bernice Holmes has become final for failure to appeal timely and her appeal is dismissed. The costs of these proceedings are cast against the appellees.
DISMISSED IN PART, REVERSED IN PART, AND RENDERED.

ON REHEARING
We granted a rehearing to reconsider our dismissal of the appeal of defendant, Bernice Holmes, our factual conclusions and our duty/risk analysis in this matter.
In our original opinion we held that the defendant, Bernice Holmes, had failed to obtain a timely devolutive appeal order. In her motion for rehearing she produced documents which reflect she did file her order of appeal with the Clerk of Court of Ascension Parish before the last day for taking such an appeal, but the trial court did not sign the order until the day after the delays had lapsed.
From the decision of Traigle v. Gulf Coast Aluminum Corporation, et al., 399 So.2d 183 (La.1981), the rule emerges that a devolutive appeal will not be dismissed when the motion for an appeal is timely filed with the Clerk of Court but the order is not signed until after the delays have run.
In the original records of both suits, the orders for appeal are incorporated therein and signed by the trial court, but no date as to the filing is shown nor can we ascertain when the orders were signed by the trial judge. In defendant's application for rehearing, she produced an affidavit of the Deputy Clerk of Court of Ascension Parish stating that the Clerk's Office received the defendant's motions for devolutive appeals before the delays for a devolutive appeal had run. In addition, defendant has a copy of a letter dated June 4, 1980, from her attorney and addressed to the Clerk of Court of Ascension Parish requesting that two motions for devolutive appeals be filed in the captioned matters. Under the circumstances, we find the defendant has shown that the motions were filed with the Clerk of Court prior to the delay for taking an appeal. Under the ruling of Traigle, the devolutive appeals of defendant Holmes are therefore timely. We therefore reinstate the appeals of this defendant.
The details of the explosion which gave rise to these two suits are set forth in our original opinion. We now conclude we were in error in holding the plaintiffs had failed to prove there were no shutoff valves at the space heaters when the gas system was inspected by an employee of Amoco. Although there is no direct evidence regarding the presence or absence of the shutoff values, there is circumstantial evidence which establishes there were no shutoff valves at the space heaters. This evidence consists of the photographs of the open gas lines, the testimony of Emma Frazier, of Lionel Ortego and of George Pappas.
As found by Mr. Ortego, Director of the Liquefied Petroleum Gas Commission, in his inspection on the day after the fire, there were two galvanized outlets in the approximate center of the house with no caps and both pipes terminated with a copper adapter used to connect space heaters. Mr. Pappas stated the adapters had an opening of a quarter of an inch and were of the kind which are used to connect to a flexible or semi-rigid copper tubing.
The testimony of these witnesses establishes that the shutoff valves should have been upstream of the adapters and that there were no shutoff valves at the time the system was inspected by Amoco.
The plaintiffs contend this act of servicing the system without shutoff valves in violation of the Commission's Rules and Regulations is negligence per se and a cause-in-fact of the explosion which renders Amoco liable citing Home Gas & Fuel Co. v. Mississippi Tank Co.,246 La. 625, 166 So.2d 252 (1964).
*100 The Supreme Court has held that violations of statutorily imposed duties do not automatically create liability in a particular civil case. Boyer v. Johnson, 360 So.2d 1164 (La.1978); Laird v. Travelers Insurance Company, 263 La. 199, 267 So.2d 714 (1972). The reason being the statutorily imposed duty may have been designed to protect someone other than the plaintiffs or to protect the plaintiffs from some evil other than the injury for which they seek recovery. Boyer, supra; Laird, supra; and Bradford v. Brewton Butane Company, Inc., 319 So.2d 892 (La.App. 3rd Cir. 1975).
For Amoco to be held liable, we must again examine the duty/risk analysis in accordance with the principles set forth in our original decision. Under that doctrine, a determination of negligence involves a two step process. First, it must be determined whether Amoco's conduct was a cause-in-fact of the harm suffered by the plaintiff, i. e., whether Amoco's conduct was a substantial factor in bringing about the accident and resulting harm. Secondly, if Amoco's conduct was a cause-in-fact of the accident, whether this act was a breach of a duty imposed on Amoco to protect these plaintiffs against the particular risk they encountered.
This court in Follins v. Barrow, 354 So.2d 609 (La.App. 1st Cir. 1977), outlined the procedure for the courts in determining cause-in-fact, as follows:
"To determine cause in fact, courts will carefully scrutinize all the evidence, and those acts will be adjudged causes in fact when it is found that more probably than not they were necessary ingredients of the accident. Stated otherwise, an act will be deemed a cause in fact of an accident only when, viewed in the light of all the evidence, it is concluded that it is a substantial factor without which the accident would not have happened. Laird, above." Follins, supra, page 611. See also Geismar General Gas Corporation, 182 So.2d 769 (La.App. 1st Cir. 1966), where this court held there must be a causal relationship between acts complained of and the results thereof to have liability.
Consideration of the facts in this case reveals acts of several individuals which could be held to be substantial factors or necessary antecedents to the accident. These can be summarized as: (1) the servicing of the gas system by Amoco Oil's representative in violation of several rules; (2) the removal of the space heaters by Emma Frazier; (3) the failure of the inspection by Bernice Holmes to reveal the open gas lines; and (4) the hooking up and using of the gas system by Christine Wenzy and Albert Wenzy.
The accident we are concerned with is the explosion and fire that occurred. The actual cause of this explosion and fire was the open gas line in the bedroom as testified to by a number of witnesses. We need to ascertain if the actions above-mentioned were causes-in-fact of this explosion, concentrating on nothing but the evidence and not taking into consideration any policy decisions. Wex Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La.L.Rev. 363.
Amoco first serviced this system in December of 1974 for its customer, Ms. Emma Frazier. At that time, Mr. Harrington made an inspection of the gas system. He supplied gas to the house which was owned by Bernice Holmes even though two of the gas outlets inside the house did not have the required shutoff valves. The system worked without incident for five months with Amoco making its last delivery of gas to Ms. Frazier in March of 1975.
In the weeks that followed, Ms. Frazier decided to move from the premises and, in so doing, she removed her two space heaters. The removal of the two space heaters left the two gas outlets open, although the gas had been turned off at the tank. Bernice Holmes made an inspection of the house but did not notice the open gas lines.
Then on May 5, 1975, Christine Wenzy began moving into the house when she and Albert Wenzy turned the gas on at the tank. Soon thereafterwards, an explosion and fire resulted.
*101 At this point we make the determination that, but for the servicing of the system by Amoco, the explosion and fire would not have occurred. The intervening acts of third parties do not prevent Amoco's actions from being classified-as a cause-in-fact of the accident. Home Gas & Fuel Co., supra.
A finding that Amoco's conduct was a cause-in-fact of plaintiff's injury does not alone establish liability. The next consideration is to determine whether a duty or standard of care was breached by Amoco which was imposed to protect against this particular risk involved. Shelton v. Aetna Casualty & Surety Company, 334 So.2d 406 (La.1976); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); and Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1970). The statutory standard of care imposed on Amoco in this case is set forth in the Rules and Regulations of the Liquefied Petroleum Gas Commission, in particular, Sections 5.14(g) and (i). Home Gas & Fuel Co.,supra; and Carlysle v. Aetna Insurance Company, 248 So.2d 64 (La.App. 1st Cir. 1971). These sections provide in pertinent part:
"5.14 Transfer of Liquids
(g) Inspection of Old System: Where an installed system has not been in use for some time, the dealer must INSPECT ALL LINES to see that they are connected to the appliances or that any openings are properly capped or plugged before filling the tank. (i) Must Not Serve Improperly Installed System: Bonded dealers must NOT SERVE any liquefied petroleum gas system which, upon investigation, is found to be IMPROPERLY INSTALLED or which is in a dangerous condition."
Mr. Ortego's inspection of the system the day after the accident revealed the following violations: (a) improper placing of the tank within ten feet of the building; (b) supply lines not buried to the proper depth; (c) no cutoff valve provided at the outside of the building; (d) no drip provided at the installation; (e) piping was not properly graded; (f) piping was not properly supported; (g) no shutoff valves provided at each appliance; and (h) two uncapped lines in the house. Mr. Ortego concluded that of the violations, only the uncapped lines were major discrepancies and the rest were of a minor nature. The only one that actually caused the explosion and fire was the open gas lines.
Plaintiffs argue that all of these violations made the entire system unsafe or dangerous and the servicing of the system was in violation of Section 5.14(i). In addition, since the actual cause of the explosion and fire was the two open lines, plaintiffs particularly point to Section 5.9(b)3 which requires that: "Any appliance connected to a piping system shall have an accessible manual shut-off valve installed upstream of the union or connector, and within six (6) feet of the appliance it serves." They contend that, if this shutoff valve was not present at the time of the inspection, the system was unsafe.
Amoco counters these contentions in three arguments. First, it avers that there was no need for a shutoff valve at the time of the explosion since there was no appliance connected to this line in the abandoned house. This argument is an after-the-fact determination and without merit.
The facts reflect that Amoco initially refused service to Ms. Frazier since she did not have her appliance hooked up. Eventually, Mr. Harrington went to the house to service the system. After an inspection of the system for leaks, he filled the tank. Upon our determination that there were no shutoff valves at the space heaters at the time of servicing, Amoco breached its statutory duty not to service an improperly installed system. The absence of shutoff valves as required by Section 5.9(b)3 made this system an improperly installed one.
Next, Amoco contends this was an old system and Section 5.14(g) only required it to inspect all lines to see if they are connected to appliances and that any openings are properly capped or plugged before filling the tank. We hold this section does *102 not relieve Amoco of the requirements of the other sections of the Rules and Regulations. Amoco was still required by Section 5.14(i) not to service an improperly installed system.
Amoco's last argument in regards to the breach of duty is based on Mr. Ortego's testimony that the general practice of the industry is to service such a system where appliances are connected with no shutoff valves. The general practice of an industry which handles inherently dangerous substances cannot overcome specific statutory provisions designed to provide a higher degree of care for the protection of the public. Carlysle, supra. Compare Bradford, supra. After considering all of these arguments, we hold Amoco did breach the statutory duty imposed upon it by servicing this system.
The next step in our duty/risk analysis is to determine whether these plaintiffs are within the scope of the duty owed and whether the risks encountered are within this duty. Laird, supra; Boyer, supra.
The risk of having an open gas line when a tenant moves from a dwelling is encompassed within the duty of having shutoff valves on the gas lines connecting the appliances. With shutoff valves installed, a tenant need only shut the valves off before disconnecting his appliances and he need not cap the gas outlets to avoid the flow of gas. The shutoff valves are designed to prevent this free flow of gasthe exact harm that occurred in this case. We hold the risk involved in this case is encompassed within the duty owed by Amoco.
Amoco avers that the rules of the LPG Commission are not designed to protect trespassers (or even legitimate occupiers) who take possession of an abandoned LP gas system absent an intervention by a gas supplier at a time contemporaneous thereto.
On original hearing we did not believe it necessary to classify the plaintiffs. At this time we hold plaintiffs acquired the classification of lessees. Although there is some doubt as to whether an actual lease agreement had been entered into between Bernice Holmes and Christine Wenzy, we find the evidence is sufficient to reveal a tentative agreement for leasing the premises. This finding is substantiated by the fact that Bernice Holmes left a key to the house with Christine Wenzy, that there was conversation about a lease agreement, and that Christine was sending Bernice a money order for the rent. Compare Young v. City of Franklinton, 387 So.2d 1390 (La.App. 1st Cir. 1980).
Amoco refers to language in the Carlysle decision, supra, to the effect that the Rules and Regulations of the LPG Commission were adopted for the protection of its customers and their premises. They contend that only Emma Frazier was their customer and that these plaintiffs were not customers of theirs within the meaning of the above quoted case.
We cannot adhere to this limited interpretation of the Carlysle decision. In making the statement, the court was emphasizing the fact that the Rules and Regulations of the LPG Commission were not for internal regulation only, but for the protection of the particular plaintiff who was its customer in that case. We hold the duty extends to any user of the gas, although not a customer of the distributor. This situation arises when a tenant is furnished with a place to live and the landlord is the actual customer of the distributor, but the tenant is the user of the gas. Therefore, all of the plaintiffs who were legally on the premises were within the scope of the duty owed by Amoco.
Finally in regards to the liability aspect of their case, Amoco asserts that Christine Wenzy was contributorily negligent. In support of this argument, it points to the testimony of Emma Frazier who claims to have told Christine Wenzy of the open gas lines.
Christine denied that Emma Frazier pointed out the opened gas lines to her and she further denied having any knowledge of open gas lines in the house.
Although the trial court did not give written reasons for its judgment, it *103 must have concluded there was no negligence on the part of Christine. The trial court is vested with the task of judging the credibility of the witnesses and deriving facts from their testimony. As an appellate court, we are not to substitute our judgment for that of the trial court. There is evidence in the record to support its holding and it is not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
In regards to the duty of Bernice Holmes as the owner of the house, we find the Carlysle case to be on all fours with this suit. Ms. Holmes stated that she had made an inspection of the house and did not discover the open gas lines. This court in the Carlysle decision sets forth the duty of a lessor:
"We have no hesitation in finding that an uncapped gas pipe would prevent the lessee from using the premises and that such a condition is a vice or defect within the meaning of Article 2695. The cases interpreting that Article have never established an affirmative duty requiring the lessee to inspect the premises for defects not readily apparent. On the contrary, the issue of contributory negligence is not even considered unless it is shown that the lessee knows of the vice or defect and even then it must appear that the premises could not reasonably be used in safety. Harrell v. Johnson, 242 So.2d 648 (1st La.App., 1970) and cases cited therein.
"Clearly, if Mr. Carlysle had actually known of the uncapped pipe, his actions in having the gas delivered and turned on would have constituted negligence because it could hardly be argued that such actions would not be imminently and apparently dangerous. But there is no evidence that Mr. Carlysle knew of the dangerous condition. Under the clear language of Article 2695, the defendant Philip Burns has failed to comply with his obligation to Mr. Carlysle to provide premises free from vices and defects and Carlysle's mere failure to discover the uncapped pipe is not negligence on his part." Carlysle, supra, page 67. See also Huggins v. Hartford Accident and Indemnity Co., 271 So.2d 876 (La.App. 4th Cir. 1973).
Falling squarely within the holding of this case, we find Bernice Holmes is liable to the plaintiffs.
Turning now to the question of quantum, defendants object to plaintiff's, Willie D. Williams, recovery for the death of Amy and Jerome Wenzy. An allegation is made in his petition that he is the children's natural father, which is denied in defendants' answer. No proof is shown of the relationship between Mr. Williams and the two deceased children and therefore the award to Mr. Williams was manifestly erroneous. The holding is not to deny recovery to a natural father for his natural children, but to deny recovery to this plaintiff since Mr. Williams did not testify at the trial and no other proof was offered to show that he actually was the children's natural father.
Plaintiffs are seeking an increase in the awards for their damages while the defendants are asking for a decrease in the awards.
Diane Knockum lived 41 days after the accident having received second and third degree burns over a majority of her body. At the time of the fire she was six months pregnant. During this period, her left leg was amputated because of infection. The trial court awarded $100,000 to Christopher Knockum for the wrongful death of his wife and $35,000 for the damages sustained by her.
Christopher Knockum was also awarded in his capacity as tutor of his daughter, Susan, the sum of $775,000 for the loss of her mother, the injury and pain and suffering sustained by her mother, and for her own damages. Susan had burns over most of her body, especially her arms and legs. The burns and permanent scars have left some webbing of her extremities. She was hospitalized for six months with a number of skin grafts.
Christine Wenzy received second and third degree burns on the face and upper extremities covering 36% of her body. *104 She was admitted to Earl K. Long Hospital on May 6,1975 and released on July 2,1975. She required physical therapy and has undergone three skin graft operations since being released. She was awarded $180,000 for her personal damages. In addition, she was awarded $100,000 for the wrongful death of Jerome and Amy Wenzy and for the damages sustained by her two children who died a day and a month, respectively, after the accident.
Finally, Claiborne White, Jr. was awarded $226,389.45 for the death of his ex-wife, Shirley Ezeff White. A fixed amount was awarded to him for the medical and funeral expenses and $225,000 was awarded to him in his capacity as tutor of his five children. Shirley White lived ten days following the accident having suffered second and third degree burns over 65% of her body.
After a careful review of the itemized elements of damages and the complete record, we find no abuse of the trial court's great discretion in the amounts awarded. Reck v. Stevens, 373 So.2d 498 (La.1979).
For the reasons assigned, the judgments of the trial court in both cases are affirmed at defendants' costs.
AFFIRMED.

ON REHEARING
PER CURIAM.
We note a technical error in the decretal portion of our judgment rendered on rehearing and amend our decree to read as follows:
For reasons assigned, the judgment of the trial court in favor of Willie D. Williams is reversed and judgment is rendered dismissing his claims.
In all other respects, the judgments of the trial court are affirmed at defendants' costs.
REVERSED IN PART AND AFFIRMED.